(956 P.2d 719)

No. 76,630

STATE OF KANSAS, *Appellee*, v. KENNETH L. MORFITT, *Appellant*.

Opinion filed March 20, 1998.

*Elizabeth Seale Cateforis*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellant.

*Thomas J. Schultz*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before KNUDSON, P.J., PIERRON and MARQUARDT, JJ.

KNUDSON, J.: Kenneth L. Morfitt appeals from jury trial convictions for attempted second-degree murder, K.S.A. 21-3402 and K.S.A. 22-3301, aggravated kidnapping, K.S.A. 21-3421, aggravated indecent liberties, K.S.A. 21-3504(a)(3), and aggravated burglary, K.S.A. 21-3716. He also appeals from the sentences that were imposed.

Morfitt contends the district court erred by: (1) failing to suppress his statement given during a custodial interrogation; (2) failing to obtain his personal consent in writing or on the record to a jury of less than 12 persons; (3) failing to instruct the jury on aggravated battery as a lesser included offense of attempted murder; (4) admitting into evidence certain items found in his car; (5) imposing a total sentence that was more than twice the base sentence of the primary crime; (6) failing to recognize the defense of voluntary abandonment; and (7) finding that the crime of aggravated kidnapping was not multiplicitous with the crimes of aggravated indecent liberties and attempted murder.

We conclude Morfitt did not personally waive his right to a 12-person jury; consequently, this case must be reversed and remanded for a new trial. We further conclude the district court erred by: (1) admitting into evidence certain items found in Morfitt's car; (2) failing to instruct the jury on aggravated battery as a lesser included offense of attempted murder; and (3) finding that the crimes of aggravated kidnapping and aggravated indecent liberties were not multiplicitous. In view of these rulings, the sentencing issue is moot.

At approximately 1:30 a.m. on May 5, 1995, Morfitt went to the home of David S., ostensibly to speak with him. David was not at home. According to Morfitt, A.S., David's 8-year-old daughter, let

him into the house. A.S. testified at trial that she was in bed and awakened by Morfitt. After about 15 minutes in the house, Morfitt persuaded A.S. to go with him to look for her father. A.S. was wearing her night shirt and underwear. Unfortunately, the baby-sitter for A.S. was asleep when Morfitt came to the house and remained so until later in the morning when David came home.

Morfitt drove A.S. around Wichita for approximately 7 hours before returning her home. A.S. testified that, at some point, Morfitt asked her if she wanted to know what interested boys about girls and then placed his hand on the outside of her clothing, touching her breasts and vaginal area.

Sometime toward the end of her ordeal, A.S. also testified that Morfitt placed a sock around her neck and began choking her. After what A.S. estimated to be 2 minutes, Morfitt suddenly quit choking her. A.S. removed the sock from her neck and asked Morfitt why he had choked her. He replied that he was afraid that her father was going to kill him. As a result of this incident, A.S. had ligature marks around her neck, bruising, and skin hemorrhages around her left eye.

Miraculously, Morfitt then returned A.S. to her home about 8:30 a.m., where the police had already started an intensive investigation to ascertain her whereabouts.

The police obtained consent from Morfitt to search his car. During the search, they located and seized a white sock from the front seat area. They seized an ice pick and an empty box for a sexual device from under the front seat. From the back seat, they seized a cordless telephone belonging to David S. that either A.S. or Morfitt had taken, another white sock, and two unused condoms from the pocket of a pair of black jeans. From the trunk, they seized the broken sexual device belonging to the box found under the front seat, a sexual videotape, and several advertisements for 900 numbers for phone sex.

Morfitt gave a custodial statement to the police. He admitted asking A.S. to come with him and driving around Wichita looking for David until the next morning. He denied that he fondled A.S. or touched her in any sexual manner. Initially, he adamantly denied ever choking A.S. but eventually changed his story and acknowl-

edged the incident occurred. Morfitt stated he did not know why he had done it. He admitted to being worried that David would hurt him for taking A.S. At one point, Morfitt told the police that he was just playing around when he put the sock around the neck of A.S. and that he removed it when she told him it was too tight. He steadfastly maintained that he never thought about killing A.S. but finally acknowledged that in retrospect "it looks like that's what I was doing, yes, and I couldn't do it."

## Waiver of 12-Person Jury

At the commencement of trial, after the jury had been impaneled and sworn, a juror informed the court of a death in his family that would require interruption of the proceedings. The trial judge explained that the trial would probably be continued until the juror could return. The jury then retired to discuss whether it would prefer to begin hearing evidence and then recess or postpone the trial until a later date. After the jury retired, Morfitt's attorney informed the trial judge, "I have just conferred with Mr. Morfitt and we're willing to go with a jury of 11. We are willing to waive [the juror's] presence and proceed to trial, if that's what the Court desires to do." The State indicated it had no objection, and the trial resumed with an 11-person jury. The trial court did not personally address Morfitt or question him about his willingness to waive his right to a 12-person jury; no written waiver was signed.

On appeal, Morfitt contends that the trial court committed reversible error because there was noncompliance with K.S.A. 22-3403(2). The State counters that Morfitt was present in the courtroom and did not voice any objection when his attorney told the court that Morfitt was willing to proceed with an 11-person jury. Thus, argues the State, Morfitt invited any error that occurred.

Because this is an issue of statutory and constitutional interpretation, our standard of review is unlimited. See *State v. Robinson*, 261 Kan. 865, Syl. ¶ 1, 934 P.2d 38 (1997).

K.S.A. 22-3403(2) states in relevant part: "A jury in a felony case shall consist of twelve members. However the parties may agree in writing, at any time before the verdict, with the approval of the court, that the jury shall consist of any number less than twelve."

An almost identical issue was addressed and decided in *State v. Roland*, 15 Kan. App. 2d 296, 807 P.2d 705 (1991). After Roland's trial began, a juror was excused because of a family death. The State, Roland's attorney, and the trial court agreed to proceed with 11 jurors; Roland did not personally consent. The jury found Roland guilty, and he appealed, claiming his right to a 12-person jury was violated.

The *Roland* court noted that the Kansas Supreme Court in *State v. Hood*, 242 Kan. 115, 125, 744 P.2d 816 (1987), interpreted K.S.A. 22-3403(2) and held:

> " 'The defendant has a right to trial by jury. This is assured to him by sections 5 and 10 of the Bill of Rights of the Kansas Constitution and by the Sixth Amendment to the United States Constitution made applicable to the states through the Fourteenth Amendment. [Citations omitted.] . . . [S]ince the right belongs to the defendant, we conclude that the defendant personally, and not counsel for the defendant, has the right to assent to a trial by less than a twelve-person jury.' [Citation omitted.]" 15 Kan. App. 2d at 297.

In *Roland*, the Court of Appeals held that a defendant must be personally advised by the trial court of his or her right to a 12-person jury and must, thereafter, personally and voluntarily waive that right in writing or in open court on the record and consent to a reduced number of jurors. 15 Kan. App. 2d 296, Syl. ¶ 3. The waiver must be made by the defendant, not the defendant's attorney, and a waiver will not be presumed from a silent record. 15 Kan. App. 2d 296, Syl. ¶ 4.

Based upon *Hood* and *Roland*, we conclude that the trial court erred in failing to personally address Morfitt and obtain his personal waiver of a 12-person jury and consent to an 11-person jury. The State's contention that this can be considered invited error does not stand up under these previous appellate decisions. We also agree with the *Roland* court that these are fundamental rights that preclude an analysis of harmless error. Consequently, we have no alternative but to reverse and remand this case for a new trial.

## Admissibility of Confession

Morfitt argues that the trial court erred in failing to suppress the incriminating statements he made to detectives during a custodial

interrogation. Morfitt's specific complaint is that after he invoked his right to remain silent, the detectives continued to question him. The following statements were made during Morfitt's interrogation:

"MM: [A.S.'s] story is you put a sock around her neck, tightened it up.

"KM: I didn't do that.

"MM: I know, okay—okay, it's not a deal of whether or not you did or didn't do it, because I know you did it. Okay, now all we need to do is talk about why you did it. I just need to know, because I know you did it. Ken. Okay, relax. Just take it easy. Take a deep breath.

"KM: Youin's are gonna send me to jail for something I didn't do.

"MM: No, listen to me. We know you did it. We know that happened. What I need to know is I need to know is I need to be able to go to the District Attorney and say, look—Ken did this. Ken messed up.

"RC: Ken's sorry.

"MM: You know, he realized it. He's sorry, he's very remorseful, but here's why he did it. You know, he just got scared or whatever the reason this is why Ken did it.

"KM: Youin's are throwing me in jail aren't you?

"MM: That at this point, you know, we haven't—you know, we're not talking about that right now, okay. What we're talking about is what I have to tell the District Attorney. . . .

"KM: They're my friends.

"MM: . . . Right, They're your friends. But sometimes we do stuff. . . . And after it's over they feel terrible because they lost control and that happens to a lot of people, a lot of people.

"KM: I don't want to go to jail.

"MM: I know you don't. I know you don't. Okay. But let me help you. Let me tell the District Attorney what happened, because I don't want them to draw their own conclusions. . . . They're not here sitting here talking to you face to face. They've got to look at my report and they say, no, he was gonna kill her.

"KM: No, I wasn't.

"MM: I don't think you were either.

"RC: Ken.

"MM: I don't think you were either. I'm on your side Ken. I want to tell you—

"KM: You all are scaring me I think, yeah, I shouldn't—

"MM: No.

"KM: —say anymore.

"MM: Okay, you want to, you know, quit talking?

"KM: Well it makes—it makes me feel like you all are sitting [sic] me up to go to jail.

"RC: Well, Ken, you got somebody who did something. Okay. They got caught and they did something. You got another person who got caught doing the same thing. Okay. This person over here, says, no, didn't do it—didn't do it. This person over here says, yeah, I did it and I'm sorry. Okay.

"MM: And do you—

"RC: Which person is gonna get the help.

"MM: Do you want to talk to me or not? If you don't want to talk to me, you don't have to.

"KM: No, I do want to talk to you.

"MM: Well, you just—

"KM: But I don't want to go to jail—

"MM: —okay, okay—

"KM: —for something that—

"MM: —okay, hold on just a minute. You just made a statement that you thought maybe you shouldn't talk to me. I want to talk to you, but I need to know whether or not you want to. You said you know, you think maybe you shouldn't but you don't know. You know, tell me—

"KM: I do want to talk."

The above excerpts from the transcript of Morfitt's interrogation disclose that, at one point, he stated he should not make any further statements. He contends this was an unconditional declaration of his desire to remain silent, which the officers should have scrupulously honored pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). We disagree because Morfitt's invocation was equivocal and almost immediately was followed by his expressed desire to keep talking to the detectives.

This issue is controlled by *Davis v. United States*, 512 U.S. 452, 459, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), and *State v. Hickles*, 261 Kan. 74, 929 P.2d 141 (1996), which reads:

"[T]he United States Supreme Court held that if an accused's reference to a *Miranda* right is ambiguous or equivocal to a reasonable officer in light of the circumstances, the officer is not required to ask clarifying questions or cease questioning and may continue questioning until the suspect clearly invokes a right." 261 Kan. at 80.

There is very little difference between what the defendant said in *Davis*, and what Morfitt said in this case. In *Davis*, the suspect, during questioning by officers, stated, "Maybe I should talk to a lawyer." 512 U.S. at 455. The Supreme Court found that that was sufficiently ambiguous that it did not require a cessation of the

questioning. Clearly, Morfitt's statement "You all are scaring me I think, yeah, I shouldn't . . . say anymore" is not constitutionally distinguishable.

Morfitt also attempts to distinguish this case from *Davis* because *Davis* involved the Sixth Amendment right to counsel and this case involves the Fifth Amendment Right to silence. This argument lacks legal merit. The Kansas Supreme Court in *Hickles*, 261 Kan. at 80, interpreted the *Davis* case as applicable to *Miranda* rights in general and not just the right to counsel.

We conclude the district court did not err in failing to suppress Morfitt's statement.

### *Battery as a Lesser Included Offense of Attempted Murder*

Morfitt was charged in count four of the information with attempted premeditated murder. The trial court also instructed the jury on the lesser included offense of attempted second-degree murder but denied the defendant's request to instruct on aggravated battery. Morfitt acknowledges that aggravated battery is not a lesser included offense of attempted first-degree murder under the "identity of the elements" test, but claims that it is a lesser included offense under the second prong of *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988).

The second prong of the *Fike* test requires the trial court to examine the allegations of the charging document and the evidence which must be adduced at trial to prove the charged crime. If the evidence that must be presented to support the crime as charged also proves the lesser crime, then the lesser crime is an "included crime" under K.S.A. 21-3107(2)(d), and the jury must be instructed accordingly. 243 Kan. at 368.

Count four of the information charging Morfitt with attempted first-degree murder states:

"[O]n or about the 5th day of May, 1995, A.D., in the County of Sedgwick, and State of Kansas, one KENNETH L. MORFITT did then and there unlawfully, towards the perpetration of the crime of First Degree Murder, as defined by K.S.A. 21-3401, commit the following overt acts, to-wit: placed a sock around [A.S.'s] neck and tightened it, causing inability to breath, redness, and abrasions, with the intention to commit said crime, and the said KENNETH L. MORFITT failed in the perpetration thereof."

Aggravated battery, K.S.A. 21-3414(1)(B), is defined, in material part, as "intentionally causing bodily harm to another person . . . in any manner whereby great bodily harm . . . can be inflicted."

The evidence presented at trial was uncontroverted that Morfitt placed a sock around the neck of A.S., choking her. There was no other evidence presented or relied upon by the State to prove the overt act alleged in the information. We conclude the evidence that was essential to prove attempted murder also proved an aggravated battery.

We find support for our conclusion in *State v. Smith*, 245 Kan. 381, 391-92, 781 P.2d 666 (1989), wherein Chief Justice McFarland (then Justice McFarland) stated:

"An act of first-degree premeditated murder by means of shooting, beating, or stabbing, etc. requires proof of an aggravated battery. *Had the victim survived the charge could have been attempted murder or aggravated battery but not both.* No case has been cited where a single act constituting aggravated battery has been held to constitute both aggravated battery and a homicide." (Emphasis added.)

We readily acknowledge *Smith* dealt with the issue of multiplicity of charges, but it nevertheless speaks directly to the significance of a single underlying act that establishes the commission of a lesser included offense.

We conclude that the failure to instruct the jury on the lesser included offense of aggravated battery constitutes reversible error. At retrial of this case, the district court should instruct the jury upon aggravated battery as a lesser included offense of the attempted homicide alleged in count four of the information.

### Items Admitted Into Evidence

Morfitt next argues that the district court erred in admitting into evidence over timely objection an ice pick, condoms, the sexual device box, the sexual device, and an "Anal Torture" video. At trial, the State reasoned that the evidence was admissible as res gestae evidence because the ice pick showed Morfitt's intent to commit premeditated murder and because the other items showed Morfitt's intent to commit a sexual act upon A.S.

Morfitt notes that there is no connection between the items and the criminal charges filed against him. He contends that the evidence did not have a natural or logical connection to the crimes and that their prejudicial effect outweighed any probative value.

Whether the district court erred in the admission of the physical evidence raises an appellate issue of abuse of discretion. See *State v. Sexton*, 256 Kan. 344, 353, 886 P.2d 811 (1994). Evidence may be properly admitted which does not constitute a portion of the crimes charged but which has a natural, necessary, or logical connection to the crime. *State v. McClanahan*, 254 Kan. 104, 116, 865 P.2d 1021 (1993). For matters to be admissible before, during, or after the happening of the principal event as a part of the res gestae, they must be "so closely connected with it as to form in reality a part of the occurrence." *State v. Davis*, 236 Kan. 538, 539, 694 P.2d 418 (1985).

Under the facts of this case, there was no justification for the admission of the complained-of evidence as a part of the res gestae of the crime. The State appears to contend that because Morfitt was charged with premeditated attempted murder and a sexual crime, anything that could have been used as a weapon or anything relating to sex would somehow have sufficient relevance to substantiate the connection. K.S.A. 60-401(b) provides that relevant evidence is evidence having any tendency to prove a material fact. To be admissible, evidence must be confined to the issues but need not bear directly upon them. *State v. Wagner*, 248 Kan. 240, 243, 807 P.2d 139 (1991).

In *Sexton*, the Supreme Court stated:

"Twenty years ago, in *State v. Fagan*, 213 Kan. 587, 589, 518 P.2d 552 (1974), this court cited the following rule from 22A C.J.S., Criminal Law § 628, pp. 472-73: 'The rule is, generally, that evidence of the attending circumstances at the time an accused is arrested, including articles of property which are found in his possession, is relevant and admissible where the circumstances logically tend to connect the accused with the crime charged.' " 256 Kan. at 353.

In the case at hand, with the exception of the cordless telephone, there is no logical connection between the items taken from Morfitt's car and the crimes he was accused of committing. Regarding the ice pick: Morfitt was accused of attempted premeditated mur-

der by placing "a sock around [A.S.'s] neck" and attempting to strangle her. He was not accused of attempting to stab her with an ice pick, using an ice pick to scare her, or even threatening her with an ice pick or some other similar object. The State did not attempt to allege that he brought the ice pick with him in preparation for the crime. On the contrary, the evidence showed that Morfitt was storing his personal belongings in the car and that the ice pick was normally carried in the car. In addition, the evidence was clear that A.S. never saw or heard about the ice pick.

Similarly, with regard to the sexual items, Morfitt was accused of fondling an 8-year-old child. There was no indication that he used any of the items taken from his car during the perpetration of the crimes, and the State did not attempt to argue that Morfitt brought the items with him with the intent to use them on A.S. Again, the evidence shows that A.S. was not aware of the items, that the items were generally stored in the car, and that the most egregious items were in the locked trunk. It should also be noted that none of the sexual items involved child pornography or would otherwise have probative value.

The Supreme Court addressed a similar situation in *State v. Bornholdt*, 261 Kan. 644, 932 P.2d 964 (1997). Bornholdt was accused of criminal possession of a firearm and first-degree murder of a witness to a drug deal. The police found drugs and drug paraphernalia in Bornholdt's car, and the district court allowed the admission of the evidence during Bornholdt's trial as a part of the res gestae of the crime. 261 Kan. at 658.

On appeal, Bornholdt argued that no direct connection could be made between the drugs or drug paraphernalia and the commission of the murder. Bornholdt contended that the evidence did not have a natural or logical connection to the murder and that the prejudicial effect outweighed the probative value. The Supreme Court found that the evidence was "clearly not part of the res gestae." 261 Kan. at 660. The court stated:

"We understand the State's contention that because the death of the victim was theorized to have resulted from his testimony in a drug case, anything relating to drugs would somehow have sufficient relevance to substantiate the connection. K.S.A. 60-401(b) provides that relevant evidence is evidence having any tendency

to prove a material fact. To be admissible, evidence must be confined to the issues but need not bear directly upon them. *State v. Wagner*, 248 Kan. 240, 243, 807 P.2d 139 (1991).

. . . .

"Once again, the connection between the evidence and murder in the present case requires an unrealistic leap of faith, and we are left with the undeniable conclusion that the admission of the drug and drug paraphernalia evidence was erroneous." 261 Kan. at 660.

Also, the connection between the evidence admitted in the case now before us and the crimes charged requires an "unrealistic leap of faith." The evidence was not part of the crimes charged and had no tendency to prove a material fact. We conclude the trial court did err in admitting the evidence and upon retrial the evidence should be excluded.

### The Defense of Voluntary Abandonment

Morfitt contends that the evidence is insufficient to support his conviction for attempted second-degree murder because he voluntarily abandoned the attempt or, in the alternative, the court erred by not instructing the jury on voluntary abandonment as a defense to attempted first-degree murder.

"When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found defendant guilty beyond a reasonable doubt." *State v. Pratt*, 255 Kan. 767, Syl. ¶ 1, 876 P.2d 1390 (1994).

K.S.A. 21-3301(a) defines an attempt as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

Morfitt argues that his failure to complete the commission of a crime precludes conviction because he voluntarily abandoned any intent to commit murder. This argument is wholly without merit. One writer on this very subject has noted:

"Assuming a defense of voluntary abandonment, does there come a point at which it is too late for the defendant to withdraw? Obviously there must be, for it would hardly do to excuse the defendant from attempted murder after he had wounded the intended victim or, indeed, after he had fired and missed. It might

even be argued that it is too late whenever the defendant has taken the last proximate step, for at that point his dangerousness is not rebutted by the withdrawal." 2 LaFave & Scott, Substantive Criminal Law § 6.3, p. 57 (1986).

Morfitt's argument comes down to the absurd proposition that he should be excused from attempted murder after he injured A.S. To the contrary, at that point in time, his "dangerousness [was] not rebutted by [his] withdrawal." Consequently, even if Kansas were to recognize a defense of voluntary abandonment, it would not be applicable in this case. We conclude there was substantial competent evidence to support the jury's verdict finding Morfitt guilty of attempted murder in the second degree and an instruction regarding voluntary abandonment would not have been appropriate.

### Multiplicitous Charges

Finally, Morfitt contends that the district court erred in finding that the charge of aggravated kidnapping was not multiplicitous with the charges of aggravated indecent liberties and attempted murder. He asks this court to reverse his conviction for aggravated kidnapping and order the district court to impose a sentence for simple kidnapping.

The difference between aggravated kidnapping and simple kidnapping is that the former requires the additional element that bodily harm be inflicted upon the person kidnapped. See K.S.A. 21-3420; K.S.A. 21-3421. In the information, the State alleged that the bodily harm or force element was committed when Morfitt committed aggravated indecent liberties upon A.S. Morfitt does not argue that the act of indecent liberties in this case was not sufficient to establish bodily harm.

"Multiplicity exists when the State attempts to use a single wrongful act as the basis for multiple charges." *State v. Garnes*, 229 Kan. 368, 372, 624 P.2d 448 (1981). Whenever an element of one crime provides the basis for a necessary element of another crime, the State may not charge the defendant with both crimes.

"Those charges which make up an integral part of another crime of which the defendant is convicted must be dismissed as multiplicitous. [Citation omitted.] The charging of a single offense as two or more separate crimes is improper because a single wrongful act should not be punished more than one time." *State*

*v. Perry*, 16 Kan. App. 2d 150, 152, 823 P.2d 804 (1991). See *State v. Brewer*, 11 Kan. App. 2d 655, 662, 732 P.2d 780, *rev. denied* 241 Kan. 839 (1987).

The question of whether charges are multiplicitous is a question of law. This court's review of conclusions of law is unlimited. See *Perry*, 16 Kan. App. 2d at 151.

The district court erred in finding that the crime of aggravated kidnapping was not multiplicitous with the charge of aggravated indecent liberties. The evidence revealed that Morfitt placed his hands on A.S.'s breasts and then on her vaginal area. It was never alleged that these events were separated by time and space. A reading of the trial transcripts and A.S.'s deposition appears to indicate that the touching occurred at the same time and was, therefore, one continuous act of force. See *State v. Harkness*, 252 Kan. 510, 532-33, 847 P.2d 1191 (1993) (holding charge of kidnapping multiplicitous with aggravated assault because it was one continuous act of force).

Accordingly, we conclude that under the information and the evidence adduced at trial, the crimes of aggravated indecent liberties and aggravated kidnapping are multiplicitous.

Reversed and remanded for new trial.